**13-1539SAG    13-1540SAG**

IN THE UNITED STATES COURT FOR THE
DISTRICT OF MARYLAND
NORTHERN DIVISION



JUN 2 4 2013

AT BALTIMORE

AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Paul Neikirk, Special Agent with the Drug Enforcement Administration, do state as follows:

1. Your affiant is currently employed by the United States Drug Enforcement Administration (DEA) as a Special Agent, and has been since September 2002. As such, I am an investigative or law enforcement officer of the United States within the meaning of Title 21, U.S.C. § 846 and empowered by law to conduct investigations and to make arrests for offenses enumerated in Title 21, United States Code Section 846. As part of my employment with DEA, I attended the seventeen week basic agent training academy in Quantico, VA. During this training I was provided instruction in criminal investigation, constitutional law, drug identification, rules of evidence, along with interview and interrogation. Additionally, I have attended numerous hours of investigative training as it relates to drug law enforcement.

2. Your affiant is currently assigned to the Washington Field Division, Baltimore District Office. In the course of my current employment, I have participated in numerous federal and state narcotics investigations relating to drug trafficking, drug smuggling, and money laundering violations. During the course of those investigations, I have been involved in the use of the following investigative techniques: interviewing informants and

1

cooperating witnesses; conducting physical surveillance; conducting short and long-term undercover operations; consensual monitoring and recording of telephonic communications; telephone pen register and caller identification system data; court-authorized electronic surveillance, including wire interceptions; and preparing and executing search warrants that have led to seizures of narcotics and other contraband. The information in this affidavit is based on my personal knowledge and information provided to me by other law enforcement officers.

3. This affidavit is submitted in support of a criminal complaint charging **Lyndon MILLER** and **Sophia WARMINGTON** with conspiracy to distribute and possess with the intent to distribute cocaine and heroin, in violation of 21 U.S.C. § 846.

4. Since November of 2011, the Harford County Task Force has received information regarding a subject by the name of "Charlie" selling significant quantities of cocaine, marijuana and heroin, which are Schedule I and II controlled dangerous substances, in Harford and surrounding counties of Maryland. During the course of this investigation, several co-conspirators have been identified and evidence has been obtained pursuant to surveillances, various records checks, informant information, and information from Pen Registers/Dialed Number Recorders (DNR), as well as controlled buys of controlled dangerous substances (CDS) by a confidential informant. During the investigation, "Charlie" was identified as Lyndon Facisco MILLER and can be described as a black, Jamaican male, 5'7", weighing 195 lbs, with a date of birth of May 11, 1965,

residing at 4509 Lyons Run Circle, Apartment 303, Owings Mills, Maryland 21117.

5. Based on the investigation, case investigators requested the State's Attorney for Harford County to petition the court for a court order allowing the interception of electronic telephonic communications. On May 7, 2013, case investigators obtained a court order signed by the Honorable Judge Angela Eaves, Judge of the Circuit Court of Maryland for Harford County, to intercept conversations over telephone lines (570) 540-0509, (443) 545-4592, (301) 501-2915, (302) 354-5798, (620) 388-3344, utilized by Lyndon Facisco MILLER (hereinafter MILLER). Subsequently, case investigators determined MILLER was also using telephone lines (302) 388-8195, (443) 252-1294, (724) 255-8960 and (251) 421-4575 and sought court orders to intercept conversations over those telephone lines.

6. Pursuant to the above mentioned electronic monitoring of the listed cellular telephones being utilized by MILLER, numerous telephone conversations were intercepted and recorded as they occurred, which enabled case investigators to identify other co-conspirators in this illegal drug conspiracy. Throughout the investigation, case investigators were able to confirm that MILLER was obtaining large quantities of cocaine and heroin and re-distributing amounts to others. It was learned over careful review of the coded conversations that persons were exchanging CDS and currency with MILLER as part of this criminal conspiracy. Although MILLER resides in Baltimore County, he is known to associate and supply Harford County, Baltimore City, Baltimore County and



Pennsylvania drug dealers.

7. Listed below are a portion of the summarized phone conversations, surveillance observations and interpretations from case investigators regarding MILLER'S drug organization.

<u>Evidence developed pertaining to the sale of cocaine:</u>

On May 11, 2013 case investigators intercepted recorded phone conversation between MILLER and a subject, later identified as Patrick Fox. During the call, investigators were able to determine that Fox would be purchasing narcotics from MILLER during an arranged deal. MILLER and Fox agreed to meet at a coded location referred to as the "bar". Knowing this to be coded conversation, surveillance believed the meet would be taking place on a desolate back road in Harford County, as this has been MILLER'S method of operation during this investigation.

Based on the call, surveillance was conducted of MILLER'S travels. At approximately 1748 hours, Detective Underhill observed a white GMC sports utility vehicle traveling on Rock Run Road from Route 161, in Harford County, Maryland. The vehicle turned onto Craigs Corner Road and pulled into the first driveway. The vehicle then backed out and sat at the intersection of Craigs Corner Road and Rock Run Road for approximately ten seconds. While the GMC remained stationary at this location, MILLER made another U-turn and the white GMC followed. MILLER and the white GMC then turned onto Cooley Mill Road. Approximately one minute later, Detective Hunt turned onto Cooley Mill Road; however, MILLER had already made another U-turn and

was traveling on Cooley Mill Road back toward Rock Run Road.

These driving maneuvers, which consist of MILLER and the buyer passing each other and completing the drug transaction during a brief moment, are the preferred method of MILLER's drug dealing. This method of operation makes it difficult for surveillance members to observe the actual drug transaction; however, based on the totality of the circumstances investigators were able to determine that MILLER and Fox met and conducted a drug transaction.

Detectives Hunt and Marston of the Harford County Task Force, continued mobile surveillance on Cooley Mill Road, locating and following the white GMC truck. Detective Hunt observed the white GMC to display Maryland registration M538331. A check of the vehicle registration plate through the Maryland Motor Vehicle Administration revealed the vehicle is a 2004 GMC truck currently registered to Patrick Lee Fox, a white male with a date of birth of 03/27/1978 of Cecil County, Maryland.

During surveillance, preparations were made to conduct an interdiction traffic stop of Fox's vehicle. Fox traveled to the intersection of Ohio Street and Rt. 40 in Havre de Grace, MD. At this time, Detective Hunt advised that Patrick Fox failed to signal when making a right turn onto Route 40 from Ohio Street. It was at this time that Officer Daniels, of the Havre De Grace Police Department, conducted a traffic stop on Fox's vehicle.

Officer Daniels made contact with the driver, identified as Patrick Lee Fox. Following a positive K-9 alert on the vehicle, the vehicle and person of Fox were



searched. During the search of Fox's GMC truck, Officer Daniels located two plastic bags containing approximately 8.5 grams of cocaine. Fox was arrested and charged accordingly.

Following an examination of Fox's phones, investigators found the phone contained MILLER'S phone number and recent call, consistent with the telephonic calls intercepted.

While this is just one example of MILLER selling cocaine, case investigators have developed a large amount of evidence that leads them to believe that MILLER is selling large amounts of cocaine in Maryland and Pennsylvania. Case investigators have recognized that throughout the investigation, MILLER has sold over 500 grams of powder cocaine.

<u>Evidence developed pertaining to the sale of heroin:</u>

During wire interception, case investigators learned that MILLER was having discussions with co-conspirators regarding MILLER establishing a market for heroin. Based on several conversations, case investigators learned that MILLER would be contacting his heroin supplier.

On May 7, 2013 at 1537 hours, case investigators intercepted a call between MILLER and his heroin source of supply (hereinafter SOS). During the call, MILLER inquired if the SOS wanted to see him.

On Friday, May 10, 2013, case investigators intercepted several calls in which MILLER tried to call the SOS, but received no answer. Soon after, surveillance

members followed MILLER traveling from his residence in Owings Mills, Maryland to Pennsylvania. Surveillance members could hear the SOS telling MILLER that he "did not have it right now" and that "he will call him". Approximately five minutes later, surveillance members observed MILLER leave Pennsylvania and return to his residence in Owings Mills, Maryland.

Following the meeting between MILLER and the SOS, case investigators learned through related calls and confidential informants that MILLER was waiting for the SOS to obtain heroin. Once this occurred, MILLER would be traveling to see the SOS to obtain a sample or quality tester of heroin.

On May 21, 2013, case investigators intercepted a call between MILLER and the SOS. During the call the two agree to meet.

After the call, at approximately 1400 hours, MILLER began to travel toward Pennsylvania. Surveillance members ultimately observed MILLER meet with the SOS. After meeting with the SOS, surveillance was conducted and MILLER was observed returning to his residence in Owings Mills, Maryland.

Based on this meeting, case investigators believed that MILLER obtained a heroin tester/sample from the SOS.

On May 29, 2013, case investigators intercepted a phone conversation between MILLER and the SOS. During the call, the SOS informed MILLER in coded language that he had "140 grams" (heroin) "from the pack" (kilogram). MILLER and the SOS agreed to meet at a later date for the next heroin exchange.

7

On May 31, 2013 case investigators intercepted recorded phone conversation between MILLER and an unidentified female subject. During the call, the female informed MILLER that she has a link into Brooklyn that she met at the hospital and that she was going to meet him that day. Case investigators believe that the female informed MILLER that she has a drug source. Case investigators know that MILLER has been trying to explore alternate cocaine suppliers to save money.

MILLER then conversed with the female regarding the "big thing" he was working on, which investigators believed to be heroin. The female questionsed if it worked out and MILLER responded that it did, making a reference to remembering all that he lost. Case investigators know that previously, MILLER lost a substantial amount of money on a deal involving nine ounces of bad heroin. It is believed that MILLER obtained the bad heroin from the SOS and when MILLER sold this heroin, the buyer would not pay for it because it was reportedly of bad quality. MILLER did not want to retrieve this bad heroin from the buyer and therefore couldn't return it to the SOS. MILLER then mentioned that the SOS doesn't trust him because of the bad heroin deal. The female then discussed the influx of one thing being low, versus being high on the other. Case investigators believe that she was discussing the demand for heroin because pills are becoming harder to acquire.

MILLER asked the female for a second opinion on the heroin deals he has been making. MILLER discussed meeting the SOS earlier in the week and getting 84 grams of heroin. MILLER went on to explain that he sold the heroin and the buyer was a good

8



boy and MILLER has seen the "paper" on him (money). MILLER then stated that he provided the white boy a large amount of heroin. MILLER mentioned that in less than a week he paid the SOS $8,500 in heroin sales, which case investigators believe is an eighth kilogram of heroin. MILLER stated that the SOS told him that he had 140 grams more that he wanted to provide MILLER.

The female responded that she was very excited about the heroin supply. The female mentioned that she had three areas that are waiting on her for heroin. The female explained that heroin is difficult to get, but the demand is more then she expected. Therefore, the buyers are more "compliant" who will pay more because they know the situation.

The female then questioned if it is a wait on the other one also? MILLER replied no, but he has to go fix "it," referring to cooking cocaine into crack, because he doesn't have it "fixed up." MILLER explained to the female that when it's hot like this (referring to the local temperature having been hot and humid), the crack just comes apart.

Using a Pen Register/Dialed Number Recorder, case investigators learned that MILLER was routinely communicating with phone number (443) 857-6377, subscribed to Sophia WARMINGTON of 4509 Lyons Run Circle, apartment 303, Ownings Mills, Maryland 21117. This is also the known address of MILLER.

Case investigators caused a check to be made of current residents of 4509 Lyons Run Circle, apartment 303 which is located in the Ownings Run Apartments complex. The check revealed the listed tenants of 4509 apartment 303 are Sophia WARMINGTON



(WARMINGTON) and MILLER's daughter, Simone Reid.

Your affiants also learned through Law Enforcement Database checks that WARMINGTON listed Dollar/ Thirty Rent a Car as her employer. This finding was confirmed by a security management representative from Dollar/Thrift car rental company. It was also discovered that MILLER has been using WARMINGTON'S credit card for the majority of his car rentals from Dollar/Thrift car rental company.

Through Maryland Vehicle Administration Check, case investigators discovered that Sophia Lorraine WARMINGTON, a black female, described as 5'07" tall, weighing 160 lbs, with a date of birth of 10/20/67, listed an address of: 4509 Lyons Run Circle apartment 303, Owings Mills, Baltimore County, Maryland 21117.

Case investigators caused a check to be made for the current criminal history of WARMINGTON. During the check, case investigators discovered that WARMINGTON, whose birth place is also listed as Jamaica, has a criminal history that includes theft over $300 in the year 2000 in Maryland.

During intercepted phone conversations occurring on MILLER'S phone line(s), case investigators were also able to determine that WARMINTON is a co-conspirator and integral partner to MILLER'S drug organization. Aside from WARMINGTON living with MILLER, WARMINGTON works at Dollar/Thrift Rental Company, where MILLER rents his cars and WARMINGTON subsequently pays for these rental cars.

The phone intercepts revealed that the MILLER and WARMINGTON'S illegal drug conspiracy is of an on-going nature where illegal drugs are constantly being distributed

and sums of money are being exchanged.

The below listed intercepted and recorded telephonic communications, as they pertain to MILLER and WARMINGTON, have been carefully reviewed by case investigators and although certain code words, Jamaican Patois dialect, are used during the conversations, case investigators, based on their training, knowledge and experience, do in fact believe that the following conversations pertain to the distribution of Controlled Dangerous Substances, specifically Cocaine, a Schedule II Controlled Dangerous Substance and Heroin, a Schedule I Controlled Dangerous Substance. Each conversation referred to in this probable cause statement has been summarized to allow case investigators to reveal concealed meanings.

On May 9, 2013, case investigators intercepted a series of phone calls between WARMINGTON and MILLER. During this series of calls, case investigators learned that WARMINGTON and her daughter Simone Reid, traveled to Jamaica. After landing, Jamaican authorities located a large sum of money hidden in shoes. Between conversations, it was indicated that Jamaican authorities located some of the money, but not all. Based on these series of calls, case investigators believe that WARMINGTON was exporting the money earned from illegal drug sales out of the United States to Jamaica.

On May 14, 2013, case investigators intercepted a series of phone calls that indicated that MILLER would be traveling to Harford County to sell narcotics.

A series of calls between WARMINGTON and MILLER were intercepted. During

11

the calls, MILLER informed WARMINGTON that the "big woman" called after he was already on the highway. MILLER requested WARMINGTON to follow him to collect "paper" (money) and grab the one thing from the fridge. This led case investigators to believe that MILLER was requesting WARMINGTON to grab an ounce of cocaine from the refrigerator for MILLER'S customer. Case investigators believe that MILLER didn't want to travel with any extra narcotics or money more than was required. Therefore, MILLER told WARMINGTON to pick up the "paper" (money) that he had collected from the sales of narcotics from customer(s). During the series of calls, MILLER and WARMINGTON arranged to meet in a secluded development off Philadelphia Road in Riverside, Harford County, Maryland.

Following the phone calls with WARMINGTON, electronic surveillance was able to determine that MILLER traveled to a location where MILLER routinely meets and exchanges cocaine with a customer.

Meanwhile, electronic surveillance determined that WARMINGTON left the area of Lyons Run Circle in Owings Mills. WARMINGTON drove to the area of Riverside, as indicated by MILLER. During this time, surveillance members followed MILLER from the drug meeting to the Riverside area. MILLER and WARMINGTON spoke multiple times regarding meeting locations until they finally arrived together in the Holly Woods neighborhood.

Surveillance members observed WARMINGTON and MILLER both stop their vehicles in the area of Holly Woods Circle for approximately 5 minutes. They parked on



a side street with minimal exposure to any surveillance units. Because of the difficult surveillance conditions, surveillance members were unable to observe any exchange.

After their brief meeting, MILLER and WARMINGTON left the area at the same time and drove towards Route 7. WARMINGTON turned south and MILLER turned north. Surveillance followed WARMINGTON and observed her turn off of Route 7 approximately ½ mile away into an apartment neighborhood on Pannell Drive. She then made an immediate right onto Lexi Drive.

WARMINGTON did not exit her vehicle, and appeared to only turn around and drive directly back out of the neighborhood without any contact with anyone there. Case investigators know that this activity is consistent with subjects involved in drug activity, as they will make sudden and unpredictable stops in an effort to see if anyone is following them.

Surveillance members followed WARMINGTON to Lyons Run Circle. She made no stops along the way. She exited her vehicle carrying what appeared to be a white plastic bag and her black pocketbook. She appeared to shuffle her items around, and then surveillance members did not see the white plastic bag anymore. WARMINGTON walked across the parking lot and visually scanned the cars on the lot. WARMINGTON appeared to pay specific attention to a covert surveillance vehicle which was parked nearby, as it was not known and frequently in the neighborhood. WARMINGTON then entered building 4509.

On May 17, 2013, case investigators intercepted two phone calls between

WARMINGTON and MILLER. During the calls, MILLER directed WARMINGTON how to cook something with boiling water. Based on these calls, case investigators believe he was giving WARMINGTON direction on cooking powder cocaine into crack cocaine. This belief was confirmed approximately two hours later, when MILLER returned home and engaged in a conversation with a subject believed to be Alexander Hinton. During the call, MILLER informed Hinton "the hoof is in effect for tomorrow, the cold foot brother". MILLER continued by stating he was bringing the "cow foot" tomorrow and he was seasoning it up and cooking it up half way and "you will be good in the morning." Hinton, who works at a barber shop, informed MILLER that the barber shop will not be busy. Aside from this call, "cold foot" is used in another call in which MILLER was obtaining a rental car from Althea Bennett, who works at Budget car rental. On that occasion, MILLER requested if Bennett wanted "cow foot" or "goat", and Bennett responded "both." Upon retrieving the rental car on this day, MILLER told her he didn't want to bring the "food" to the counter and requested she come to the back door to obtain the "cow foot" (crack-cocaine) and "goat" (powder cocaine).

On May 19, 2013 case investigators learn that MILLER was returning his rental car and getting a new one. After retrieving the new rental vehicle, MILLER engaged in several calls with WARMINGTON about her getting the cocaine ready for MILLER to sell throughout the day and delivering the CDS to him. MILLER and WARMINGTON discussed buyers by name, number amounts, bringing phones and a work suit (vest), what to package the drugs in (brown bag) and the meeting location. After the

aforementioned meeting, the two engage in another call, in which MILLER was asking which bag the phone is in, showing she may have dropped off multiple bags.

On May 23, 2013, case investigators intercepted another call between MILLER and WARMINGTON in which they reference drugs by using coded food talk. During this call, MILLER requested WARMINGTON to drop the "goat" things and the "other thing" for him now. WARMINGTON replied "now?", as if she didn't want to do it and MILLER responded "yes".

On May 26, 2013, case investigators intercepted a call between WARMINGTON and MILLER. During the call, MILLER requested WARMINGTON to activate the phone for the "big woman", an ounce level drug buyer and "Dane", also a known drug buyer. Case investigators know that MILLER commonly changes phones during the investigation as a precaution, should it become compromised by law enforcement.

On Friday June 21, 2013, case investigators intercepted phone calls between MILLER and his SOS. During the conversations, MILLER made arrangements to travel to Pennsylvania to pick-up a large amount of heroin the following day.

On Saturday June 22, 2013, surveillance was conducted of MILLER traveling to Pennsylvania. Once in Pennsylvania, MILLER met with the SOS. During the meeting, case investigators believe that MILLER provided the SOS with United States Currency in exchange for a large amount of heroin.

After the meeting was complete, surveillance was conducted, as MILLER returned to his residence in Owings Mills. MILLER was accompanied by WARMINGTON to and



from Pennsylvania. Once MILLER and WARMINGTON entered their housing development, the Harford County Task Force, assisted by the Baltimore County Police Department, apprehended MILLER and WARMINGTON.

Prior to the apprehension of MILLER and WARMINGTON, search warrants were completed for MILLER'S vehicles and his residence. The warrants were reviewed and signed by the Honorable Mimi Cooper, Judge of the District Court for Harford County.

Once MILLER was in custody, a K-9 sniff of the rental car he was operating for the trip to Pennsylvania was conducted. While a search warrant had not been obtained for this vehicle, a police K-9 gave a positive alert to the driver's side door of the vehicle. A search of the vehicle revealed approximately 700 grams of suspected heroin. A field test of the substance resulted in a positive reaction for the presence of heroin.

MILLER'S and WARMINGTON'S other vehicles and residence were searched. During the search of the vehicles and residence the following items were located: 932 grams of suspected powder cocaine; 28 grams of suspected crack cocaine; a loaded Glock model 22 .40 caliber handgun; and approximately $81,000 U.S. Currency. Subsequent field testing of both the suspected powder and crack cocaine resulted in a positive reaction for the presence of cocaine.

Based on the foregoing, there is probable cause to believe that MILLER and WARMINGTON, did conspire with others known and unknown to distribute and possess

13-1539SAG    13-1540SAG

with the intent to distribute cocaine and heroin, in violation of 21 U. S. C. § 846.

I, Paul Neikirk, affirm under penalties of perjury that the facts and circumstances recounted are true and accurate to the best of my knowledge, information and belief.

_____
Paul Neikirk
Special Agent
United States Drug Enforcement Administration

Signed to and sworn before me this 24th day of June 2013.

_____
Stephanie A Gallagher
United States Magistrate Judge

17